# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MATTHEW K. PINGEL,

        Plaintiff,

    v.                              Case No.  14-C-1476

CAROLYN W. COLVIN,
Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER

---

On July 2, 2010, Plaintiff Matthew Pingel filed an application for disability and disability insurance benefits alleging disability beginning October 10, 2005. His date last insured is September 30, 2008. Plaintiff's application was denied initially and on reconsideration. Following a hearing on September 10, 2013, an administrative law judge (ALJ) found the medical evidence to show that Plaintiff has affective and anxiety disorders in addition to polysubstance dependence. However, the ALJ also found Plaintiff to be not entirely credible and held that Plaintiff was not disabled within the meaning of the Social Security Act as of his date last insured. The Appeals Council subsequently denied review, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff filed this action for judicial review. For the reasons given below, the decision of the Commissioner will be reversed and remanded.

## I. BACKGROUND

Plaintiff was 20 years old and driving forklift at Borden's dairy plant when on October 6, 2005, he became acutely unresponsive and catatonic, resulting in his employer sending him to an

urgent care center. At the hospital Plaintiff could only slowly follow commands, could not provide a medical history, moved little, and struggled to respond to questioning. (R. 359, 365–66, 361–62). A urine drug screen and all other testing returned negative results. (R. 359). In the week before the hospitalization, Plaintiff had been increasingly unresponsive and nonverbal while at home and at work. Plaintiff received inpatient treatment from October 6, 2005 through October 23, 2005. With medication, he began talking again after receiving individual psychiatric care and counseling. Plaintiff eventually disclosed to his mother that his difficulties were precipitated by harassment at work by the father of one of his high school friends. (R. 380.) The medical center's final diagnosis included findings of catatonia and a psychotic disorder, with a global assessment functioning (GAF) of 25 to 30 on admission and 55 to 60 on discharge. (R. 356.) Plaintiff was discharged with a plan for close outpatient follow up and prescription medications (Effexor, Zyprexa, Risperdal, and Cogentin). He was also told to abstain from driving, alcohol, and drugs, with cautions about operating machinery. (R. 357.)

Plaintiff's treating psychiatrist, Stephen Krummel, M.D., and therapist, Audrey Aardappel M.S.W., L.C.S.W., continued to see Plaintiff on an out-patient basis after his discharge from the hospital on October 23, 2005. Ms. Aardappel assigned him a GAF score of 65 by February 2006, noting his communication difficulties but also recognizing his goal-directed thought processes. By April 6, 2006, Plaintiff indicated that he felt "75% himself." Plaintiff was driving again and stated he had been to Florida with his family over the last month and had a good time visiting some amusement parks, like Busch Gardens. (R. 384.) Although Ms. Aardappel's May 8, 2006 note indicates a reluctance on Plaintiff's part to go back to work at the dairy plant (R. 387), he did return by early June. Dr. Krummel noted in May 2006 that Plaintiff was doing fine and in good spirits.

2

He denied being depressed, his affect brightened and his mood was normal with no thought disorder or psychosis. (R. 394.)

The following month, Dr. Krummel noted that Plaintiff continued to do well. Plaintiff had been back to work for three weeks and reported no problems driving a forklift and doing what he had to do. Plaintiff seemed quite happy and denied any problems with fatigue or motor coordination. He denied any depression and said he had been doing some fishing on weekends. He reported no problems with his medications. On mental status, Dr. Krummel noted Plaintiff's affect appeared mildly restricted and he was a bit quiet, but "does brighten when discussing work." (R. 396).

In July 2006, Dr. Krummel noted that Plaintiff had some difficulty moving to third shift at work. He got anxious and had difficultly sleeping during the day. He went home after vomiting earlier in the week and thought it might have been the heat. Otherwise, his moods had been pretty good and he had not been having any psychotic symptoms. On mental status exam, Dr. Krummel noted that Plaintiff looked quite good, his affect was bright, and his mood was normal. He was talkative and showed no signs of depression. There was some discussion of medically restricting him to first or second shift, but Plaintiff wasn't sure there would be work for him and wanted to try going back on third shift. Dr. Krummel added a prescription for 10 mg of Ambien for help with sleep and authorized a return to work on third shift to see if Plaintiff could adjust. (R. 397.)

On August 11, 2006, Plaintiff called Dr. Krummel after he tripped over some shoes in the locker room at work and strained his arm. Concerned that it might be medication-related, Dr. Krummel kept Plaintiff off of work until he could see him on August 23, 2006. At that time, Plaintiff appeared to be doing fine. He reported he had no problems running the forklift or doing

3

other jobs at work. He reported no imbalance or dizziness, but Dr. Krummel lowered his medication dosages slightly because he reported some mild tremors. Again, he was pleasant with bright affect and mood normal. (R. 400.)

Plaintiff's last therapy session with Ms. Aardappel was on September 12, 2006. He told her he had some difficulties but overall was doing well at work. He did not like changing shifts but was coping with it, and was interested in finding a girlfriend. He felt comfortable and, with the agreement of Ms. Aardappel, concluded he was no longer in need of therapy. (R. 393.)

Shortly thereafter, Plaintiff was laid off or terminated from his job at the dairy plant. When he next saw Dr. Krummel on November 13, 2006, he was still out of work, but seemed to be doing well. He had had no problems with depression, being withdrawn, or paranoia. He denied any problems with his medications and stated he planned on attending a job fair. Dr. Krummel noted that he is pleasant, his affect was bright and he was talkative. He was able to express what was going on, his thoughts were tracking well, and he did not appear depressed or paranoid. (R. 402.)

At this point, there is a gap in the treatment records. Plaintiff did not see Dr. Krummel again until August of 2007. On August 6, 2007, Plaintiff's mother called Dr. Krummel and reported that Plaintiff and his father got into a physical altercation, likely as a result of alcohol use, leading to Plaintiff being jailed. (R. 404–406.) Plaintiff came in to see Dr. Krummel the following week. Dr. Krummel noted in his report that Plaintiff had not been in for awhile. With respect to the fight with his father, Dr. Krummel noted that the two were apparently drinking and Plaintiff's father may have thrown the first punch. Plaintiff was upset because he could not find work. He had done some dishwashing but nothing more. He reported that he had been taking his medications and not drinking regularly. Though somewhat withdrawn with restricted affect, he denied ongoing

4

depression, paranoia or psychosis.  The following month, Dr. Krummel discharged Plaintiff from his care after Plaintiff attempted to forge a prescription for Oxycodone by adding the drug to a prescription for his other medications.  (R. 408.)

Following his discharge by Dr. Krummel, Plaintiff's mother reported that Plaintiff became much worse without his medication.  (R. 228.)  On May 8, 2008, Plaintiff presented to Dr. Deubler, seeking medications for his nerves.  Plaintiff noted he had not been taking his medications since about November 2007.  (R. 441.)  Dr. Deubler noted very poor communication skills, failure to complete sentences, and that Plaintiff seemed to stare right through him.  Dr. Deubler diagnosed Plaintiff with psychological process and possible depression, and prescribed Effexor with a follow-up in two weeks.

Two weeks later on May 23, 2008, Dr. Deubler noted little change.  Plaintiff's affect was unchanged and he continued to have problems with speech and completing sentences.  Dr. Deubler increased Plaintiff's prescription for Effexor.  (R. 443.)  Dr. Deubler next saw Plaintiff on July 17, 2008, at which time he noted that Plaintiff continued to be almost nonverbal, requiring Dr. Deubler to get information from his mother.  He notes Plaintiff had been given a one-week supply of Abilify 5 mg daily and was now seeking a prescription for 10 mg daily.  Dr. Deubler wrote the prescription and gave them a sample kit for Effexor.  Dr. Deubler also recommended to Plaintiff's mother that he be seen by a psychiatrist because his problems "are more than I can handle."  (R. 445.)

Shortly thereafter, Plaintiff appeared to have moved from the Sheboygan area.  Plaintiff presented to a new primary care physician at Family Health/La Clinica on December 31, 2008, because he was told he had high blood pressure while selling blood plasma.  The report notes that he had a normal affect and ability to make good eye contact with slight nervousness or fidgeting.

5

(R. 270.) At a follow-up appointment for his high blood pressure complaint on February 23, 2009, Dr. Fred Gross noted that Plaintiff's anxiety and depression were improved and he discussed with Plaintiff weaning him off of the Abilify and alprazolam. (R. 269.) On March 18, 2009, Plaintiff was seen for back pain after he slipped on ice. The following week Plaintiff was seen again for high blood pressure and indicated his anxiety is under decent control. (R. 267.) In August 2009, Plaintiff was seen for knee pain which he claimed started when he fell on his bike the previous winter.

Finally, on October 1, 2009, more than a year after his date last insured, Plaintiff had an office visit with his chief complaint concerning his mental health. According to the notes, Plaintiff was brought in by his mother's boyfriend with a report that he had been "going downhill psychologically over the last few months." (R. 265.) Dr. Gross spoke to Plaintiff's mother by phone and was told that, although Plaintiff has had fairly good success on Effexor and Abilify in the past, she was not sure if he was still taking his Effexor. He had not been taking the Abilify for at least six months, and his condition had deteriorated. According to his mother, Plaintiff had more recently been staring into space, talking about things that don't make sense, and acting as though things that happened long ago had just occurred. (R. 265.) Dr. Gross decided to restart Plaintiff on Effexor and Abilify, and wean him off of alprazolam. Ten days later, Plaintiff was much improved. He was much more verbal, coherent, and responsive to questions. (R. 264.) He reported that he was not so much depressed as just having difficulty putting thoughts and actions together.

The next entry isn't until June 3, 2010, for a skin problem. (R. 262.) Plaintiff complained of a lump on his chest. Though Plaintiff reported no depression or loss of interest in activities over the past two weeks, he was reminded to follow up with his primary care physician for his

6

depression. He agreed to do so, but the visit dealt mostly with his plan to discontinue smoking. (R. 263.)

Between late 2009 and March of 2011, it appears that Plaintiff had a number of stays in the Waushara County Jail. (R. 303–29.) Over the next several years, Plaintiff's condition seems to have further deteriorated as he was in and out of jail and on and off his medication. On March 11, 2011, Waushara County jail officials referred Plaintiff for a mental health assessment noting that he appeared disoriented and unable to make sense or speak meaningfully. (R. 309.) A cerebral CT scan was performed at Wild Rose Community Hospital, which was essentially negative. (R. 302.) In May 2011 Plaintiff went to the emergency room seeking a refill of his Vicodin prescription, which he had been denied by another doctor earlier in the day. (R. 334.)

These later treatment records shed light on Plaintiff's drug abuse during the relevant period. A 2012 Human Services In-Depth Assessment records that Plaintiff reported use of Vicodin, Percocet, or Oxycontin from the ages of 18 to 26, as much as 5–8 pills per day. (R. 544.) That same assessment documents Plaintiff's extensive involvement with the legal system in 2007, including charges of possession of cocain, marijuana, and drug paraphernalia. (R. 545.) Other records include statements by Plaintiff indicating daily marijuana use and heavy drinking during the relevant period. (R. 475.) He was also diagnosed with drug-seeking behavior and a thought disorder. In November 2011, Plaintiff's mother reported that Plaintiff's symptoms had heightened along with drug and alcohol use. (R. 496.) It had been almost two months since he had any of his medications.

In 2012 Plaintiff's records indicate noncompliance with his medication regimen and continual abuse of drugs and alcohol. In March he was hospitalized under the State of Wisconsin

7

Civil Commitment statute. (R. 541.) For the six to seven months before his commitment he had not been on his medications, but had a twice a week cocaine habit and used marijuana and alcohol on a daily basis.

At the time of the ALJ hearing in August 2013, Plaintiff was working in a sheltered workshop for fewer than five days per week. (R. 52.) Plaintiff typically worked 6-7 hours a day and for only a half-day on Fridays. (R. 64.) Plaintiff was provided transportation to and from the workshop and he could take breaks whenever he needed to. (R. 52–53.) His job involved using electric scissors to cut fabric, with him getting paid for each piece of fabric cut. (R. 62–64.) Plaintiff had never earned more than $720.00 in one month while working at the sheltered workshop. (R. 53.)

Records from late 2010 contain analysis of the plaintiff by three physicians on behalf of the state disability determination service (DDS). Dr. Ronald Shaw wrote in his case analysis that Plaintiff's physical allegations were not severe. (R. 283.)

In November 2010, Plaintiff was seen by Dr. Scott Trippe, a licensed psychologist, for a consultative examination. Plaintiff told Dr. Trippe that the medication and counseling worked well. (R. 273.) He also described himself as happy and the examiner noted no signs of depression, anxiety, or psychomotor agitation. Plaintiff reported to Dr. Trippe that he had occasional drinking bouts after turning 21 with occasional use of marijuana, Vicodin, and mushrooms during middle school and high school. (R. 273.) Dr. Trippe diagnosed plaintiff with anxiety, but not schizophrenia or depression, assigning him a GAF score of 55 to 60. Dr. Trippe offered the following statement of work capacity:

8

The claimant displays no limitation on his ability to understand, remember, and carry out simple instructions. The claimant displays a mild-to-moderate limitation in concentration. The claimant displayed a moderate limitation in his ability to take directions from authority figures. The claimant displayed a moderate limitation in his ability to work with peers. The claimant displayed a mild-to-moderate limitation in his ability to maintain a regular schedule of activities. The claimant displayed a moderate limitation in his ability to understand, remember, and carry out complex instructions. The claimant displays a moderate-to-marked limitation in his ability to tolerate stress at work.

(R. 276.)

A psychiatric review in December 2010 by Roger Rattan, Ph.D., found Plaintiff to have anxiety-related disorders but no substance addiction disorders. (R. 284.) Dr. Rattan noted in the narrative section of the Mental RFC Assessment form that Plaintiff showed no limitation in his ability to understand, remember, carry out instructions; mild to moderate limitations in his ability to concentrate; moderate limitation in his ability to respond to others; mild-to-moderate limitation in his ability to maintain persistence/pace; and that he may have difficulty responding appropriately to increased stress at work. (R. 300.) Notwithstanding these limitations, Dr. Rattan concluded that Plaintiff "remains capable of performing and maintaining basic unskilled work," and his psychological symptoms and functional limitations "do not appear to limit him to less than being able to perform and maintain basic unskilled psychological work related functions." (R. 300.) Beth Jennings, Ph.D., reviewed Plaintiff's file for SSA and affirmed Dr. Rattan's opinion in August 2011. (R. 355.)

On September 10, 2013, the ALJ issued a decision finding Plaintiff not disabled under sections 216(i) and 223(d) of the Social Security Act through the relevant period ending in September 30, 2008. (R. 33.) The ALJ found Plaintiff to be not entirely credible, citing to the short-lived nature of Plaintiff's medical episodes and quick recovery, Plaintiff's ability to perform

Case 1:14-cv-01476-WCG   Filed 01/20/16   Page 9 of 24   Document 17

a wide range of activities, Plaintiff's extensive and hidden drug use, and Plaintiff's revision of his own medical history. (R. 27–29.) With all this in mind and after a review of the record, the ALJ found that as of the date last insured Plaintiff had retained a residual functional capacity (RFC) limited to jobs that can be learned by short demonstration; involving no dealing with the public; and involving no work in concert or cooperation with co-workers. (R. 25.) The ALJ also found claimant to have a RFC to perform a full range of work at all exertional levels. (*Id.*) Based on the vocational expert's testimony and taking into consideration Plaintiff's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the State of Wisconsin economy that he could have performed. (R. 32.)

## II. ANALYSIS

### A. Standard of Review

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## B. Assessment of Medical Source Opinions

Plaintiff first challenges the ALJ's decision by arguing that his decision lacked evidentiary support because he "played doctor" by rejecting portions of two State agency experts and one examining doctor. Specifically, Plaintiff argues that the ALJ erred in discounting portions of the RFC findings by Drs. Trippe, Rattan, and Jennings. As Plaintiff correctly notes, the RFC is an assessment of the maximum work-related activities a claimant can perform despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–1001 (7th Cir. 2004), citing *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 CFR §404.1545(a)(1). Additionally, the "RFC must be assessed based on all the relevant evidence in the record." *Id.* An ALJ "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). Plaintiff argues that the ALJ failed to give specific, legitimate reasons for rejecting the medical opinions in this case.

Key to the Court's review of the Commissioner's decision is the recognition that the question before the ALJ was not whether Plaintiff at some point in time became disabled, but whether he was disabled within the meaning of the Act as of September 30, 2008, when he was last

11

insured. This is important because much of Plaintiff's argument focuses on evidence of his condition long after his last insured date. For example, Plaintiff argues that "[b]y 2011 Pingel was frequently disoriented, incoherent, vague, and elusive upon examinations" and notes that in 2012 he was subject to an involuntary civil commitment proceeding. (ECF No. 14 at 3–4.) But the question before the ALJ was not whether Plaintiff was disabled in 2011 or 2012; the question was whether he was disabled by September 30, 2008. On this issue the direct evidence is sparse.

It is undisputed that Plaintiff's initial hospitalization on October 6, 2005 was a significant episode. He was non-responsive and appeared catatonic while at work and was hospitalized for a period of three weeks. But as the ALJ noted, his condition dramatically improved with medication within seven months of his hospitalization. The ALJ found that the medical reports of his improvements were corroborated by the level of daily activities the Plaintiff undertook during the relevant period. He reported that he had gone to Florida with his family and had a good time visiting amusement parks, that he was fishing on weekends, and was mowing the lawn and helping around the house. (R. 384, 388.) He was released to work without restrictions in late May 2006 and successfully returned to work shortly thereafter, reporting no problems and seeming "quite happy about it." (R. 394, 396.) Although he lost his employment within four months, there is no evidence, either lay or expert, that he was unable to perform his job because of physical or mental impairments. After he lost his job at the dairy plant, he attended job fairs and continued to seek full-time employment. (R. 402.)

It is true that Plaintiff did not obtain full-time stable employment over the remainder of time he was insured. It was during this same period of time, however, that the ALJ noted that Plaintiff was engaging in anti-social behaviors such as drug and alcohol abuse which led to legal difficulties,

12

including his forgery of a prescription for Oxycodone which led to the termination of the relationship with Dr. Krummel in September 2007. (R. 545, 408.) The Seventh Circuit has noted that when an applicant has both a potentially disabling illness and is a substance abuser, the issue for the ALJ is whether, were the claimant not a substance abuser, he would still be disabled. *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006). Here the ALJ found insufficient evidence to show that absent his drug and alcohol abuse, Plaintiff could not have held a job during the relevant time period.

In his argument to the contrary, Plaintiff relies heavily on the opinion of Dr. Trippe that his persistence and pace were both impaired by anxiety. (ECF No. 14 at 3.) But as the ALJ recognized, Dr. Trippe's evaluation of Plaintiff took place in November 2010, more than two years after Plaintiff's last insured date. Of course, this raises the question of why the Agency failed to request Dr. Trippe to provide an opinion of Plaintiff's mental RFC as of the date last insured. Even so, I cannot say that the ALJ erred in giving little weight to Dr. Trippe's opinions. The ALJ also noted that Dr. Trippe did not have the opportunity to see Plaintiff over time, nor did he have the benefit of the later medical evidence documenting Plaintiff's extensive substance abuse. (R. 30–31.) Moreover, Plaintiff told Dr. Trippe that his medication worked well, described his mood as happy and denied irritability or crying spells, and displayed no signs of depression, anxiety, or psychomotor agitation. Even as late as November 2010, Dr. Trippe assigned Plaintiff GAF scores of 55 to 60, suggesting at most moderate functional limitations. (R. 28.)

Plaintiff also argues that the ALJ erred in rejecting the opinions of Dr. Roger Rattan, the state psychological consultant who reviewed the record and completed a Psychiatric Review Technique (PRT) form and a Mental Residual Functional Capacity Assessment (MRFCA) form in

13

December 2010. In support of this argument, Plaintiff notes that Dr. Rattan checked box on the PRT indicating a moderate degree of limitation in maintaining social functioning and maintaining concentration, persistence or pace. (R. 294.) Plaintiff notes that Dr. Rattan also checked the boxes in Section I, the "Summary Conclusions" section of the MRFCA form, indicating Plaintiff was moderately limited in "his ability to maintain attention and concentration for extended periods of time, perform activities within a schedule, maintain regular attendance, work in coordination with others, complete a workday or workweek without interruptions from his psychological symptoms, perform at a consistent pace without an unreasonable number of breaks, and respond appropriately to changes in the workplace." (ECF No. 14 at 7 (citing R. 299)). Plaintiff contends that Dr. Rattan's assessment, which was later affirmed by Dr. Beth Jennings, another state consultant, was for his date last insured. (R. 298, 355.) Given these findings of moderate limitations, Plaintiff argues the ALJ was required to find him disabled as of his last insured date.

At the outset, it should be noted that it is also unclear whether Dr. Rattan's assessment was retrospective. Although he checked a box indicating his assessment was for September 30, 2008, the date last insured, Dr. Rattan also checked the box indicating his assessment was for the date of his evaluation, which was December 8, 2010. (R. 298, 300.) In addition, the narrative section of the report where Dr. Rattan explained his summary conclusions in narrative form is in the present tense and describes his current condition and treatment. (R. 300.) Thus, it is unclear whether any medical opinions in the case even addressed the key question of the severity of Plaintiff's mental impairment as of September 30, 2008.

In any event, contrary to Plaintiff's contention, the ALJ did not reject the opinions of Drs. Rattan and Jennings but instead gave partial weight to them. (R. 30.) The ALJ found the findings

14

of mild limitations in activities of daily living and moderate restrictions in social functioning and maintaining concentration, persistence or pace "incompatible with the evidence documenting the claimant's improvement with treatment within seven months of his hospitalization as well as his good range of daily activities showing him capable of reasonably good social and mental function." (*Id.*)  But as Plaintiff points out, the consultants had essentially the same record of improvement before them and nevertheless concluded that Plaintiff had the limitations indicated, suggesting that there is no inconsistency.  Additionally, the ALJ failed to explain why Plaintiff's improvement cast doubt upon the limitations noted by the state consultants.  Absent such explanation and given the fact that the experts knew of the same improvement, the ALJ's rejection of these findings cannot stand.  *See Beardsley v. Colvin*, 758 F.3d 834, 839–40 (7th Cir. 2015) (holding that ALJ erred in rejected physician's opinion without legitimate reasons showing good cause for rejecting it).

More importantly, however, the ALJ noted that Drs. Rattan and Jennings specifically concluded that Plaintiff had "the mental capacity for the basic demands of unskilled work."  (*Id.*) In other words, the same psychologist who checked the boxes indicating moderate limitations in various areas of mental functioning provided his opinion as to the impact these limitations would have on Plaintiff's ability to undertake and maintain work.  Dr. Rattan's opinion, confirmed by Dr. Jennings, was that while Plaintiff's reported psychological symptoms and functional limitations appear credible, they "do not appear to limit him to less than being able to perform and maintain basic unskilled psychological work related functions."  (R. 300.)  Thus, as the ALJ noted, the opinions of Drs. Rattan and Jennings were consistent with the RFC he found.

Were it not for Seventh Circuit precedent on this very issue, I would be inclined to conclude from this that the ALJ did not err in his evaluation of the opinions of the state consultants and his

15

conclusion that those opinions supported the RFC he found. As this court has attempted to explain on several occasions, *see Kraus v. Colvin*, 2014 WL 1689717, **12–17 (E.D. Wis. April 29, 2014); *Varga v. Colvin*, 2014 WL 1089740, **2–5 (E.D. Wis. March 19, 2014), *rev'd,* 794 F.3d 809 (7th Cir. 2015); and *Baumgartner v. Colvin*, 2013 WL 5874633, **12–15 (W.D. Wis. October 31, 2013), under the Agency's own rules and regulations, as well as the instructions on the forms themselves, an expert's entries for the "B" criteria on the PRT form and in the "Summary Conclusions" section of the MRFCA form are not intended to constitute mental RFC findings.

The PRT form is intended to insure that the Agency's "special technique" is followed in determining whether an alleged mental impairment meets or is the equivalent of a "listing" or, if not, requires a detailed RFC assessment. *See* 20 C.F.R. § 404.1520a(d). ALJs are explicitly instructed by the Agency's own rulings that the limitations shown for the paragraph "B" criteria are not a residual capacity assessment, but are used only to rate the severity of the mental impairment at steps 2 and 3 of the sequential evaluation process. *See* SSR 96–8p, 1996 WL 374184, *4 (1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF."). The ALJ in this case expressly acknowledged this ruling in the following boilerplate language that appears in almost all ALJ decisions discussing mental impairments:

16

The limitations identified in "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(R. 25.) Thus, notwithstanding Plaintiff's contention that the ALJ erred in failing to include the findings from the PRT form for the paragraph B criteria in his mental RFC, a careful reading of the Agency's own rules and regulations shows that the ALJ complied with them.

The same is true of the "Summary Conclusions" section of the MRFCA form Dr. Rattan completed. The boxes checked in the "Summary Conclusions" section of the MRFCA form are not intended as mental RFC findings any more than those checked on the PRT form. The instructions state "[d]etailed explanation of the degree of limitation for each category (A through D), as well as any other assessment information you deem appropriate, is to be recorded in Section III (Functional Capacity Assessment)." (R. 298.) According to the Agency's Program Operations Manual System (POMS), "**Section I is merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS, DI 24510.060 (bold in original); *see also Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010) ("Because Smith cannot rely on the worksheet component of the Mental Residual Functional Capacity Assessment to contend that the hypothetical question was deficient, his argument is without merit as it pertains to Dr. Tan and Dr. Graff."). Thus, based on the Agency's own rules and regulations, it would appear that the ALJ was entirely justified in ignoring Dr. Rattan's Section I "Summary Conclusions" and relying instead upon his conclusion in Section III

17

of the MRFCA form that Plaintiff "remains capable of performing and maintaining basic unskilled work." (R. 300.)

Notwithstanding the foregoing, however, the Seventh Circuit has rejected the argument that the ALJ's finding of moderate limitations in "paragraph B" criteria at steps 2 and 3 are not RFC findings. *Varga v. Colvin*, 794 F.3d 809, 815 (7th Cir. 2015). The Seventh Circuit has also rejected the argument that the Commissioner may ignore the moderate limitations a state consulting psychologist notes in the "Summary Conclusions" section of the MRFCA form and rely instead upon the narrative conclusion in Section III. In *Yurt v. Colvin*, the Court held that the ALJ erred in relying upon the consulting psychologist's conclusion that the claimant retained the capacity for unskilled work even though the consultant had checked boxes on the MRFCA form indicating the claimant was moderately limited in six work related functions. 758 F.3d 850, 857–58 (7th Cir. 2015). In so ruling, the Court seemed to acknowledge that an ALJ could ignore limitations the consultant listed in the worksheet if they were adequately covered in the consultant's narrative conclusion. *Id.* at 858–59. But the Court failed to say how the ALJ is to determine whether the consultant has accurately translated his worksheet finding of a moderate limitation into the mental RFC the consultant describes in narrative form in his conclusion. Presumably, the answer depends on what the consultant means by a "moderate" limitation, but this is not much guidance for the ALJ. As the Third Circuit has acknowledged, the Agency's definition of "moderate" as used in the MRFCA form "does not require that the individual's capacity be at a level that is unacceptable in a national workforce; rather, the instructions specify that '[t]he degree and extent of the capacity or limitation must be described in narrative format in Section III.'" *Smith*, 631 F.3d at 637 (quoting POMS DI 24510.063(B)(2) (indicating that "moderately limited" should be selected when "the

18

individual's capacity to perform the activity is impaired")). In at least one functional area, however, the Seventh Circuit has provided clear guidance: "we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Id.* (citing *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008); *Young v. Barnhart*, 362 F.3d 995, 1004 (7th Cir.2004)). This aspect of *Yurt* was reaffirmed in *Varga*.

In light of *Yurt* and *Varga*, I must conclude that the ALJ erred in his assessment of the state consultants' opinions and in failing to include in his RFC the fact that Plaintiff had moderate limitations in at least some of the work functions listed in the summary worksheet of the MRFCA form. Though Drs. Rattan and Jennings may have thought that limiting Plaintiff to "basic unskilled work" adequately addressed the functional limitations they noted in the "Summary Conclusions" section of the MRFCA form, *Yurt* requires more. *Yurt* apparently requires the ALJ to compare the checked boxes in Section I of the MRFCA form to the consultant's narrative summary of the claimant's mental RFC in Section III and then add limitations for those functions for which the "moderately limited" box is checked if they are not otherwise accounted for in the consultant's narrative conclusion. In other words, the ALJ may not assume that the consultant has followed the Agency's instructions in completing the MRFCA form and incorporated into his Section III narrative a "detailed explanation of the degree of limitation for each category [of work related function]." (R. 298.) Because the ALJ made such an assumption here, the Commissioner's decision must be reversed.

19

My conclusion is not without some uncertainty, however, and the Commissioner may wish to seek further clarification of these issues from the Court of Appeals. These issues repeatedly appear in many of the denials of Social Security Disability benefits that federal courts are called upon to review and that continue to cause much confusion. For although *Yurt* and *Varga* rejected the Commissioner's argument that the limitations in the Section I "Summary Conclusions" section of the MRFCA form are not RFC findings, the Agency's own rules, as explained above, provide otherwise, and other courts have agreed with the Agency. In *Smith*, as already noted, the Third Circuit, relying on the Agency's POMS, found the argument that the worksheet summary conclusions constituted RFC findings "without merit." 631 F.3d at 637. The Sixth, Ninth and Eleventh Circuits have reached the same conclusion, albeit all in unpublished opinions. *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 563 (6th Cir. 2014) ("These multiple sources make clear that Section III not only provides a more thorough and detailed assessment than the checklist in Section I, but also reflects the doctors' actual findings regarding their understanding of Griffith's work-related limitations."); *Israel v. Astrue*, 494 F. App'x 794, 797 (9th Cir. 2012) ("Israel argues without support that references to 'opinions' in these Social Security Rules refer not to a doctor's assessment as a whole but to each identifiable element of the MRFCA, which would require ALJs to interpret a psychologist's checked box rather than rely on that psychologist's considered medical assessment."); *Land v. Comm'r of Soc. Sec.*, 494 F. App'x 47, 49 (11th Cir. 2012) ("The Social Security Administration's Programs Operations Manual System (POMS) clarifies that the boxes checked by Dr. Zelenka and Dr. Vergara are only part of a worksheet that 'does not constitute the [doctors' actual] RFC assessment.' POMS DI § 24510.060(B)(2). Checking the box 'Moderately Limited' means only that the claimant's capacity is impaired; it does not indicate the degree and

20

extent of the limitation. *See id.* § 24510.063(B)(2). After checking the boxes as an 'aid,' *id.* § 24510.060(B)(2), a doctor is then required to detail his actual RFC assessment. *See id.* § 24510.060(B)(4).")"; *Jones v. Comm'r of Soc. Sec.*, 478 F. App'x 610, 612 (11th Cir. 2012) (same).

Even the Seventh Circuit's treatment of the issue is unclear. In *Johansen v. Barnhart*, the Court rejected the argument that the ALJ erred in formulating the RFC by failing to include functional limitations for boxes checked indicating moderate limitations in the ability to maintain a regular schedule and attendance and complete a normal workday and workweek without psychologically-based symptoms where the consultant had translated his findings into an RFC consisting of low-stress, repetitive work. 314 F.3d 283, 289 (7th Cir.2002). More recently, in *Capman v. Colvin*, the Court rejected a claim that the ALJ had erred in failing to include moderate limitations in persistence, concentration and pace on the Section I checklist in the RFC assessment, noting that "the ALJ may reasonably rely on the examiner's narrative in Section III, at least where it is not inconsistent with the findings in the Section I worksheet." 617 Fed. App'x 575, 579 (7th Cir. 2015). But why is it ever inconsistent to find that despite a claimant's moderate limitations in a particular area of function, he or she retains the ability to perform work that requires some degree of ability in that area, especially where "moderate limitation" simply means some impairment?

Unless clarification on these issues is obtained, the Commissioner should change the Agency's forms and instructions so that the consultants and ALJs will know that the boxes checked in Section I of the MRFCA are in fact RFC findings, at least in this circuit. Similar changes should be made to the PRT form and the accompanying rules and regulations so as to alert ALJ's that contrary to the language of SSR 96-8p quoted above, limitations on "paragraph B" criteria at steps 2 and 3 of the sequential evaluation are in fact RFC findings. Without such changes, and in the

absence of clarification, the confusion surrounding the use of these forms will only continue to cause repetitive, costly and time-consuming litigation instead of providing claimants and ALJs the bright line rules needed to allow prompt dispositions of these important cases with some confidence that they will be upheld.

**C. Credibility Determination**

Next, Plaintiff challenges the ALJ's credibility finding as being based in factual mischaracterizations and legally improper analysis. Plaintiff contends that the ALJ's credibility assessment was "patently wrong" because he fails to account for Plaintiff's medical conditions in assessing Plaintiff's reliability. According to Plaintiff, his particular illness renders him a poor historian but does not make him a liar. But no one argues that Plaintiff's symptoms make him more credible. Rather, Plaintiff's inability to recount the truth, whether produced by disability or willfully engaged in, is a valid reason for the ALJ to doubt Plaintiff's version of events. Plaintiff brought before the ALJ a new story about what caused his 2005 hospitalization. Specifically, he claimed that a head injury led to the hospitalization. It makes perfect sense, as Plaintiff contends, that a person admitted to a hospital in a catatonic state would not remember what brought him there. It also makes perfect sense, however, that the ALJ would question Plaintiff's reliability in this area, given the nature of his symptoms. In addition to being logical, the ALJ's reasoning is supported by reports of Plaintiff's counselor, who noted how Plaintiff would change reports about important events and blame others. (R. 482).

The record indicates rapid and strong improvement following Plaintiff's 2005 hospitalization. During the months after the hospitalization Plaintiff had increased GAF scores, self-reported that he was doing well, indicated that he was feeling 75% himself, been released back to

work, and had been described in treatment notes as doing fine with no depression. Treatment notes additionally reflect his recovery and the benefits he gained through medications. Later in 2006, treatment notes indicated Plaintiff's positive mood and good health. The ALJ noted all of these factors in comparing the record to Plaintiff's allegations of debilitating symptoms. While Plaintiff argues that improvement in condition does not necessarily mean Plaintiff was fit for full time work, Plaintiff failed to set forth evidence showing how the recorded improvements could coexist with Plaintiff's claimed debilitating limitations. Similarly, Plaintiff argues that the ALJ was incorrect in relying on his return to work as evidence of his recovery, because Plaintiff only returned to his job for a few months. However, the ALJ's reasoning did not rely on Plaintiff being able to return to his old work, only that he could return to some work, and Plaintiff's return to work for a period of a few months clearly indicates that he had greatly improved after his hospitalization. The ALJ further bolstered his reasoning through a discussion of Plaintiff's daily activities, which reasonably could be used to show that Plaintiff had largely recovered after his 2005 hospitalization.

Plaintiff attacks the ALJ's use of Plaintiff's history of substance abuse, claiming that the ALJ did not clearly explain why Plaintiff's drug use lowered his credibility. Contrary to Plaintiff's arguments, however, the ALJ rationally drew a connection between Plaintiff's drug use and his credibility. The ALJ wrote that earlier diagnoses can be called into question by the revelation about the extent and time frame of Plaintiff's drug use. (R. 29.) Recent treating providers have diagnosed Plaintiff with a drug-induced mental disorder and substance abuse. These diagnoses have only been made possible by Plaintiff's relatively recent openness about his history of drug use. Plaintiff's historical failure to be honest about his drug use also serves as anecdotal evidence of his limited

credibility. Therefore, the ALJ properly and logically incorporated Plaintiff's recent admission of his drug usage as evidence of Plaintiffs lack of credibility.

Given Plaintiff's inability to accurately recall critical events in his medical history, recent revelations regarding Plaintiff's drug use, and the inconsistencies between Plaintiff's story and the evidence of improvement and daily activities, I cannot say that the ALJ's credibility determination was "patently wrong."

### III. CONCLUSION

For the reasons given above, I conclude that the ALJ erred in his assessment of the opinions of the state consultants by failing to include in the RFC the moderate limitations identified in the MRFCA form. The decision of the Commissioner is therefore reversed and remanded pursuant to 42 U.S.C. § 405(g) (sentence four). On remand, the ALJ should also make clear to the experts that the issue to be determined is Plaintiff's mental RFC as of the date last insured.

**SO ORDERED** this   20th   day of January, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

24